THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| REDLAND INSURANCE COMPANY<br><br>    Plaintiff,<br><br>V.<br><br>TRUMBULL SHOPPING CENTER, LLC<br>#2 a/k/a WESTLAND PROPERTIES, INC.<br>a/k/a WESTLAND PROPERTY, INC.<br>a/k/a WESTFIELD AMERICA, INC. a/k/a<br>WESTFIELD CORPORATION, INC. and<br>JANET EDWARDS,<br><br>    Defendants. | CIVIL ACTION NO. 3:03 CV 0329 (AWT)<br><br><br><br><br><br><br><br>DECEMBER 30, 2003 |

**MEMORANDUM OF LAW IN SUPPORT OF WESTLAND'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Redland Insurance Company ("Redland") brought this action seeking a declaration of

its obligations to defend and indemnify defendant Westland Properties, Inc. ("Westland").[1]

Redland's Complaint asks this Court to issue a declaratory judgment that it neither has the duty

to indemnify nor defend Westland in an underlying personal injury lawsuit scheduled for trial in

Connecticut Superior Court in February, 2004. Redland's request for declaratory relief

involves two discrete provisions within a single additional insured endorsement. The facts

---

[1] The full name of the first-named defendant is Trumbull Shopping Center, LLC #2 a/k/a Westfield Properties, Inc. a/k/a Westland Property, Inc. a/k/a Westfield America, Inc. a/k/a Westfield Corporation, Inc. For ease and because the owner of the subject premises is Westland Properties, Inc., the defendant hereafter will be identified as "Westland."

1

establishing coverage for Westland are few, clear, and undisputed -- making the Complaint ripe for summary judgment.

Westland was named as an additional insured on the general liability insurance policy (the "Policy")[2] of E2, Inc. ("E2") for a Christmas show (the "Show") E2 performed at the Trumbull Shopping Mall now known as Westfield Shoppingtown Trumbull (the "Mall"). Affidavit of Nikki Riccio dated December 29, 2003 (the "Riccio Aff.") at ¶ 7, submitted herewith. The plaintiff in the underlying personal injury lawsuit, Janet Edwards, an actress working for E2, injured herself when she fell off a temporary stage during the Show. Redland Complaint for Declaratory Judgment (the "Complaint") at ¶ 7; Riccio Aff. At ¶¶ 17, 19. She brought suit against Westland and E2 in Connecticut Superior Court. Complaint at ¶¶ 5-6.

Westland required that E2 add it as an additional insured to E2's general liability insurance policy before the Show took place. Riccio Aff. At ¶ 11. It did so, obviously, to ensure that it would not incur liability because of E2's conduct. By including the specific additional insured endorsement in the Policy, Redland promised E2 that it would extend its protection to E2's clients. When it issued the Certificate of Insurance naming Westland as an additional insured, Redland promised Westland that it would extend its protection to Westland. But rather than provide Westland with the promised coverage, Redland has generated additional risk and extensive costs for Westland. Redland's strategy is clear – it commenced this declaratory judgment action to gain advantage over Westland by threatening to extinguish all rights to coverage while the trial in the Edwards lawsuit is pending, with the hope that Westland will contribute to settlement or the payment of a judgment in the event the lawsuit

---

[2] A copy of the Policy is attached at Tab B to the December 29, 2003 Affidavit of S. Peter Sachner (the

2

settles or proceeds to judgment. However, Redland's obligations to Westland are clear and inescapable. Westland respectfully requests that the Court reject Redlands' attempt to use the federal district court as a means of gaining unfair advantage in the defense of the underlying state court action, and, instead, grant Westland summary judgment on the Complaint.

### I. STATEMENT OF FACTS

Westland is the owner of what is known as Westfield Shoppingtown Trumbull (the "Mall"). Complaint at ¶ 2. On or about October 14, 1999, Westland entered into a written contract with E2 for a Christmas show to take place at the Mall on November 18, 1999 (the "E2 Contract"). Riccio Aff. ¶¶ at 4-5; Tab A, Riccio Aff. Westland required that E2 name Westland as an additional insured on its general liability policy. Id. at ¶ 11.

#### A. **Westland's Certificate of Insurance and the Redland Policy.**

Before the concert, E2's insurance agent issued a Certificate of Insurance to Westland. Riccio Aff. At ¶ 12. The Certificate stated that the Certificate Holder, Westland,[3] "is named as an additional insured as respects the operations of the named insured." Riccio Aff. at ¶ 12, Tab B, Riccio Aff. The Certificate referred to a general liability policy (the "Policy") issued by Redland to E2 that lists E2, Inc. as the named insured. Complaint at ¶ 9; Tab B, Sachner Aff.

The relevant insuring agreement of the Policy, in Section 1-Coverages, Coverage A,

---

"Sachner Aff.") submitted herewith.

[3] The entire description of the additional insured on the Certificate of Insurance is:
Westfield America, Inc., Westland Properties, Inc., Westfield Corporation, Inc., and any and all of their respective, partners, subsidiaries and affiliates together with any mortgagee from time to time of the landlord's interest are named as additional insured, as their interests may appear. The term "Affiliates" when used in connection with any specified entity, means any person or entity which directly or indirectly, controls, is controlled by, or is under common control with the specified entity.

All certificates must show the "Affiliate" language.

obligates Redland to "pay those sums that insured becomes legally obligated to pay as damages because of bodily injury' or 'property damage' to which this insurance applies." The Policy Endorsement GL Conpro 1 1298 (Concert Promoter Program Special Endorsement) (the "Endorsement") contains an "Additional Insureds" section, which provides in relevant part that:

> Only if specifically declared as an "Additional Insured" with respect to a specific concert, as evidenced by a Certificate of Insurance issued for the Named Insured by or on behalf of the Company, it is agreed that the "Who Is An Insured" provision is amended to include as an Insured any person or organization of the types designated below, but only with respect to liability arising out of the Named Insured's operations as a concert promoter:
>
> 1. Owners and/or Lessors of premises leased, rented or loaned to the Named Insured, subject to the following additional exclusions:
>
>    a. This insurance does not apply to any occurrence which takes place after the Named Insured ceases to be a tenant in said premises;
>
>    b. This insurance does not apply to structural alterations, new construction or demolition operations performed by or on behalf of the owner and/or lessor of said premises;
>
>    c. This insurance does not apply to any design defect or structural maintenance of said premises.

Complaint at ¶¶ 11, 13; Tab B at p. 62 CONPRO 1 1298, at 1, Sachner Aff; Sachner Aff. at ¶ 5. The Certificate of Insurance identifies Westland Properties, Inc. specifically as an additional insured. Riccio Aff. at ¶ 12, Tab B, Riccio Aff. It also names Westfield

4

Corporation, Inc. and all of its affiliates.[4]  Id.

B.  **Edwards' Injury and the Edwards' Lawsuit.**

The E2 Contract directed Westland to provide a ten foot by ten foot "staging area" for the show. Riccio Aff. at ¶ 6; Tab A, Riccio Aff. The Contract did not indicate in any way why those particular dimensions were needed. Id. On November 18, 1999, Westland erected a temporary stage in the Mall shortly before E2 arrived for the show. Id. at ¶ 7. The temporary stage consisted of three separate portable components, each with a four foot by eight foot platform, fastened securely together. The stage platform measured two feet tall. After the concert was over, Westland disassembled the stage. Id.

Edwards and Matthew Miller, both of whom were independent contractors hired by E2 to perform the show, arrived at the Mall approximately two hours before the show. Id. at ¶ 8. Nikki Riccio met them and told them that the temporary stage was eight feet by twelve feet rather than ten feet by ten feet. Id. Ms. Riccio stated that, if the stage size was inadequate for the performance, Westland could remove the stage and E2 could perform the show on the floor. Id. Miller and Edwards declined the invitation to remove the stage and instead, used the stage as is. Id. They rehearsed on the stage before the concert. Id. at ¶ 9.

Edwards dressed in a Paddington Bear costume for the show. Id. at ¶ 4. During the show, she fell off of the front of the stage and injured herself. Id. at ¶ 10. At no time during the performance was the structural integrity of the stage itself compromised. Id. Indeed, no such claim of any structural defect has been claimed. Edwards simply fell off the front of the

---

[4]  The definition of additional insured used in the Certificate of Insurance is broad. The Certificate was issued by Entertainment Brokers, International ("EBI"). If EBI was acting as Redland's agent when it issued the Certificate, Redland may be estopped from asserting that any claimed defect in the Certificate of Insurance defeats coverage.

stage. Id.

On or about March 8, 2000, Edwards brought a lawsuit in Connecticut Superior Court for her injuries sustained in the fall (the "Edwards Complaint").[5] Complaint at ¶¶ 5-6; Tab A, Sachner Aff. In her complaint, Edwards claims that her injuries were caused by the negligence of E2 and Westland. Complaint at ¶¶ 7-8. Specifically, she alleges with respect to Westland that:

> [Her injuries] were proximately caused by [the] negligence of defendant [Westland] in one or more of the following ways: (a) failure to provide the plaintiff with a stage of an adequate size on which to perform; (b) failure to provide the plaintiff with a stage that featured adequate and proper safety devices; (c) failure to inform the plaintiff sufficiently in advance of the aforesaid children's performance of the size of the available stage; and (d) failure of the defendant to apprise itself in advance of the plaintiff to undertake the performance in a safe manner.

Edwards Complaint, First Count, ¶ 5. Tab A at ¶ 5, Sachner Aff. The Second Count of the Edwards Complaint states a claim for negligence against E2.[6] Id.

### C. Redland's Declaratory Judgment Action.

After being served with the Edwards Complaint, Westland tendered to Redland a claim for defense and indemnity coverage under the Policy. Sachner Aff. at ¶ 6Redland accepted Westland's tender of the claim, admitting that Westland was an additional insured, but then

---

[5] The trial is scheduled to begin on February 17, 2004.
[6] Specifically, Edwards claims that her injuries were "proximately caused by the negligence of [E2] in one or more of the following ways: (a) it failed to provide the plaintiff with a safe work place in which to perform; specifically, a stage of an adequate size and one which featured appropriate and necessary safety devices; (b) it failed to learn sufficiently in advance of the aforesaid performance of the size of the available stage on which the performance was to occur; (c) it failed to inform the plaintiff sufficiently in advance of the performance of the size of the stage on which she was to perform; and (d) it failed to cancel or postpone the performance until a stage of an adequate size and one which featured appropriate and necessary safety devices was obtained. See Edwards

6

subsequently denied the claim[7]. Westland sued for bad faith denial of the claim in Connecticut Superior Court. Westland and Redland entered into a written Settlement Agreement ending Westland's bad faith action against Redland.[8] Tab D, Sachner Aff.; Sachner Aff. at ¶¶ 5,7. In the Agreement, Redland agreed (1) to pay Westland $50,000 in exchange for withdrawing the bad faith claim; and (2) to assume the defense of Westland under a reservation of rights. Westland, in turn, expressly reserved its right to seek its attorneys' fees and expenses from Redland in the event Redland pursued a declaratory judgment action and lost. Tab D at Sec. 3.2, Sachner Aff.

Redland seeks two separate rulings from the Federal District Court: (1) that Redland does not have an obligation to pay for Westland's defense in the Edwards Lawsuit; and (2) that Redland does not have an obligation to indemnify Westland for any amount Westland is required to pay in the Edwards Lawsuit as a result of a judgment.

## II.   LEGAL DISCUSSION

In its Complaint in the declaratory judgment action, Redland claims that Westland is not entitled to coverage under the Additional Insured Endorsement for the following reasons: (1) Westland did not "lease, rent or loan" the premises to E2, Inc.; and (2) coverage is excluded because the injury was caused by a "design defect or structural maintenance of said premises." "The purpose of a Declaratory Judgment action is to secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties." <u>Conn. Assn. of Health Care Facilities, Inc. v. Worrell</u>, 199

---

Complaint, Second Count, ¶ 4. Tab A at ¶ 4, Sachner Aff.

[7]   <u>See</u> copy of the July 13, 2000 declination letter from Redland (redated to protect work-product) attached to the Sachner Aff., Tab C, and the Sachner Aff. ¶ 6.

7

Conn. 609, 613 (1986); see also Doublewal Corp. v. Toffolon, 195 Conn. 384, 391-92 (1985).

A.  **Summary Judgment Standard.**

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and that therefore it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. Id. at 248. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. Id.. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could reach different conclusions, summary judgment is inappropriate. See Riley v. Brown & Root, Inc., 896 F.2d 474, 476-77 (10th Cir. 1990).

In order to establish the existence of a genuine issue of material fact sufficient to defeat summary judgment, Redland "must set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). This summary judgment motion, however, relies on the construction of the insurance policy at issue. Certainly, Redland will agree that the "construction of a contract of insurance presents a question of law for the court. . . ." Aetna Life & Cas. Co. v. Bulaong, 218 Conn. 51, 58 (1991).

---

[8]  A copy of the Settlement Agreement is attached to the Sachner Aff. at Tab D..

**B.      Standard for Construing Insurance Policies Under Connecticut Law.**

Under Connecticut law, the terms of an insurance contract are construed according to the general rules of contract construction. Schultz v. Hartford Fire Ins. Co., 213 Conn. 696, 702 (1990). The policy language controls the extent of coverage. Enfield Pizza Palace, Inc. v. Ins. Co. of Greater New York, 59 Conn. App. 69, 74 (2000). Courts give the words used in a policy their plain, popular and ordinary meaning. Shilberg Integrated Metals Corp. v. Continental Cas. Co., 263 Conn. 245, 267-68 (2003); Kelly v. Figueiredo, 223 Conn. 31, 35 (1992).

> The determinative question is the intent of the parties as to what coverage the insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the policy. If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. When terms of an insurance contract are, without violence, susceptible to two equally responsible interpretations, the interpretation sustaining the claim and covering the loss _must_ be adopted.

Western World Ins. Co. v. Peters, 989 F. Supp. 188, 190-91 (D. Conn. 1997) (citations and internal quotation marks omitted) (emphasis added).

Determining whether an ambiguity exists is a threshold question of law for the court. See Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537, 543 (1996). If an ambiguity exists, Connecticut courts will apply the canon of construction know as "contra proferentem." Id. at 545. "[T]he general rule ... is ... that where a policy of insurance is so framed as to leave room for two constructions, the words used should be interpreted most strongly _against_ the insurer." Liverpool & London & Globe Ins. Co. v. Kearney, 180 U.S. 132, 136 (1901)(emphasis added).

9

Case 3:03-cv-00329-AWT   Document 22   Filed 12/31/2003   Page 10 of 15

>The premise behind the rule is simple. The party who actually does the writing of the instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of interests. . . . A further, related rationale for the rule is that since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter.

Hansen, 239 Conn. at 544. In Connecticut, "the canon contra proferentem is more rigorously applied in insurance than in other contracts." Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 602 (2d Cir.), cert. denied, 331 U.S. 849 (1947). The rule is applied with particular force when there is an ambiguity in an exclusionary [provision of the contract.]" B. Ostrager & T. Newman, Handbook of Insurance Coverage Disputes, § 1.03[b][1] (10th Ed. 2000); see also Heyman Assoc. No 1 v. Insurance Co. of the State of Penn., 231 Conn. 756, 770 (1995); Moore v. Continental Casualty Co., 252 Conn. 405, 409 (2000).

In this action, the Court is asked to construe coverage for Westland as an additional insured under the Endorsement. The only facts necessary to this decision are (1) Westland's qualifications as an additional insured under the Endorsement; and (2) facts concerning whether the accident at issue in the Edwards Lawsuit arose from a design defect in Westland's premises. The facts are undisputed. The plain language of the subject policy as applied to these undisputed facts leads to the conclusion that Redland is obligated to provide Westland with a full defense and provide full indemnity for any judgment against Westland.

10

C.      **<u>Westland Is an Additional Insured Under the Endorsement.</u>**

Redland claims in its Complaint that Westland does not qualify as an additional insured because it is not an "owner[] and/or lessor[] of premises leased, rented or loaned to the named insured." See Complaint at ¶ 16. This provision in the Endorsement creates an additional insured status if two conditions are met: (1) that Westland is the owner or lessor of the premises; and (2) that Westland leased, rented or loaned the premises to E2. Westland meets both of these conditions.

Redland itself admits that Westland meets the first condition. It alleges in its Complaint that Westland was the owner of the premises. See Complaint at ¶ 2. See also Riccio Aff. at ¶ 3. Westland also meets the second condition. Westland clearly "loaned" the Mall premises to E2 so that E2 could put on the Show. Courts construe insurance policies according to their plain meaning and common usage, and courts enforce policy language as written. The plain meaning of the term "loan" is a grant of permission to use something - - in this case, the use of the Mall's common area for purposes of putting on the Show.

Connecticut courts often look to dictionary definitions as authority for a given word's common usage. See e.g. Moore, 252 Conn. at 410-11. The Random House Webster's College Dictionary, for example, defines the noun "loan" as "the act of lending; a grant of the temporary use of something . . . ."[9]

It strains the bounds of reasonable interpretation for Redland to claim that Westland somehow was not an "owner" of premises "loaned" to E2. It is clear that the Endorsement was

---

[9]    The complete definition is as follows: 1. the act of lending; a grant of the temporary use of something; *the loan of a book.* 2. something lent or furnished on condition of being returned, esp. a sum of money lent at interest. 3. LOANWORD. – v.t. 4. to make a loan of; lend: *Will you loan me you umbrella?* 5. to lend (money) at interest. –

designed to provide coverage for businesses in Westland's position.[10] Whenever E2 promotes concerts on its clients' premises, its clients understandably seek insurance coverage for any potential liability arising out of E2's operations. This is precisely the coverage that Redland agreed to provide to E2, further agreed to provide to E2's clients, and which coverage Westland required E2 to provide it in conjunction with putting on the Show at the Mall. Redland's position on this provision is untenable, reasonable, and further is persuasive evidence of bad faith insofar as it manifests an obvious intention to deny coverage rightfully owed Westland.

D.   **The Exclusion for "Design Defect or Structural Maintenance of the Premises" Does Not Bar Coverage for Westland.**

Redland claims that the Endorsement does not provide coverage to Westland as an additional insured because the "insurance does not apply to any design defect or structural maintenance of said premises." Complaint at ¶ 15. The exclusion, however, does not apply to Edwards' injury because the injury was not caused by any defective or otherwise problematic condition of the premises. Edwards specifically claims, instead, that Westland was negligent (1) by providing a stage of inadequate size; (2) by providing a stage without safety devices; (3) by failing to inform Edwards of the size of the stage sufficiently in advance of the Show; and (4) by failing to apprise itself in advance of the performance of the requirements of Edwards' performance. See Edwards Complaint, First Count, ¶ 5. Complaint at ¶ 8; Tab A at ¶ 5,

---

v.i. 6. to make a loan or loans; lend. – *Idiom*. 7. on loan, loaned or borrowed for temporary use or employment.

[10]   The show that E2 provided to Westland under the E2 Contract was described by the E2 Contract as a package available to any client. It describes the Show as the "Paddington's Night Before Christmas Event Package" and refers to the client's obligation to provide a "staging area." See Addendum 1 to the E2 Contract. Tab A, Riccio Aff. It is clear that when a client purchased this package, it was purchasing the performance of a show to take place on its premises.

Sachner Aff. In short, Edwards simply claims that she fell because the temporary stage was too small for the performance. Accordingly, the exclusion does not apply to her accident for three separate reasons.

First, the temporary stage was not part of Westland's premises. The plain ordinary meaning of "premises" is real property – the land and the building itself. It does not include a portable, temporary structure, such as the stage used by E2. The Random House Webster's College Dictionary defines "premises" as "a tract of land including its buildings," or a "building or part of a building together with its grounds or other appurtenances."

Clearly, the temporary stage was a separate and distinct structure independent of the Mall's premises. It was erected on the day of the Show, and was taken down shortly after the Show. Riccio Aff. at ¶ 7. Hours before the Show, Nikki Riccio advised E2 and Edwards of the dimensions of the stage, and offered to have the stage taken down and instead have the Show take place on the floor without the stage. Id. at ¶ 8. Notably, in fact, the E2 Contract required Westland to provide a "staging area" for the Show. Tab A, Riccio Aff. Westland offered either the Mall floor or the stage as the "staging area." E2 and Edwards rejected the offer to perform the Show on the floor and instead elected to conduct the Show on the stage. Riccio Aff. at ¶8. The temporary stage was not part of the Mall's premises because it was not part of the building or land. Accordingly, the exclusion does not apply.

Second, the Edwards accident was not caused by a "design defect" or by "structural maintenance." There is no evidence whatsoever that the stage had any design defects. A design defect occurs when something is manufactured or built in accordance with its intended design, but the design itself creates an unreasonable danger. See Black's Law Dictionary, p.

418 (6th ed.). There is not a shred of evidence that a design defect in the stage caused Edwards to fall off the stage. Throughout the course of the Show, the structural integrity of the stage itself was not compromised, Riccio Aff. at ¶ 10, and indeed, no claim to this effect has been asserted.

Simply stated, to the extent that the temporary stage was at all involved in causing Edwards' accident, it could only be because the stage was too small for the Show. But this scenario cannot lead to the conclusion that the stage was somehow defectively designed. The stage was constructed of portable, interchangeable component parts, to be assembled and used as needed for any number of productions. Riccio Aff. at ¶ 7. The size of the stage needed by a given production depends on the needs of the production. Clearly, the stage was not defective in its design or construction; rather, Edwards simply fell off the state – one that she alleges was too small for her performance.

Finally, there is no allegation of -- or any evidence of -- any maintenance of the premises, structural or otherwise, performed by Westland that arguably caused Edwards injuries - nor could there be. The term "maintenance" means the preservation of an existing condition.[11] The temporary stage had been constructed the day of the performance. Id. at ¶ 7. Further, the exclusion pertains to the "maintenance of said premises." As expounded above, "premises" means the existing grounds or building of the Mall, and any maintenance relevant to this controversy would necessarily pertain to the Mall's real property – not to a temporary stage. Moreover, Edwards does not allege any maintenance problems in her Complaint. See

---

[11] "The term [maintain] is variously defined as acts of repairs and other acts to prevent a decline, lapse or cessation from an existing state or condition...." Black's Law Dictionary, p. 863 (6th Ed.); see also The Random House Webster's College Dictionary ("maintain... 1. to keep in existence or continuance; preserve....").

Tab A, Sachner Aff. Maintenance was not an issue.

It is clear from reading the entire Endorsement that it was intended to provide coverage to E2's clients for liability arising out of E2's performance on their premises. The exclusion at issue was designed to prevent that coverage from extending to conditions at the client's site that are entirely outside of E2's control – such as a poorly designed floor or roof, or a poorly maintained floor. However, E2's election to use the temporary stage after Westland notified E2 of its dimensions and after Westland offered the use of the floor instead (as the "staging area") could only be construed as the failure to exercise reasonable care at the time the election was made. This, then, is an issue of negligence to be decided by the trier of fact – not an issue of a design defect or a problem with the structural maintenance of the Mall's premises. Accordingly, the exclusion does not bar coverage to Westland.

E.    **Redland Clearly Has a Duty to Defend Westland.**

The determination of whether Redland has a duty to defend Westland is determined by comparing the terms of the insurance policy with the allegations contained in the Edwards Complaint. This is so because "an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying] complaint." Springdale Donuts, Inc. v. Aetna Cas. and Surety Co., 247 Conn. 801, 807 (1999) (citations and internal quotation marks omitted). "It is the allegations on the face of the complaint that govern the duty to defend." Schwartz v. Stevenson, 37 Conn. App. 581, 586 (1995) (internal quotation marks omitted); Board of Educ. v. St. Paul Fire & Marine Ins. Co., 261 Conn. 37, 41 (2002). If the Complaint sets forth a cause of action within the coverage of the policy, the insurer must defend its insured. Id.